# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify the person by name and address)*<br><br>A premises located at 1226-1228 E. Florence Avenue, Los Angeles, California 90001, described further in Attachment A | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)     Case No. 2:20-MJ-00231 |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| | |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of _____ days (*give exact ending date if more than 30 days*: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent Susan E. O'Brien, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____

_____
*Judge's signature*

City and state: Los Angeles, California

Hon. Alexander F. MacKinnon
*Printed name and title*

AUSA: Lauren Restrepo x3825

## **ATTACHMENT A**

<u>PREMISES TO BE SEARCHED</u>

The premises located at 1226-1228 E. Florence Avenue, Los Angeles, California 90001 (the "SUBJECT PREMISES").  The SUBJECT PREMISES is a two-story, commercial building off-white in color.  The exterior of the street level of this location is mostly large glass windows and a glass double-door for entry/exit.  "1226-28" is stenciled on the transom in black.  "1226" is affixed vertically along one of the door frames.  Metal roll-down doors are secured above the windows and door.  The second story has double hung windows across the front.

**ATTACHMENT B**

I.   **ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of Title 18, United States Code, Section 2320(a) (Trafficking in Counterfeit Goods and Services) and Title 18, United States Code, Section 371 (Conspiracy) ("the Subject Offenses"), namely:

a.   Any automotive parts or accessories that appear to be counterfeit, including but not limited to bumpers, nameplates, mud flaps, door sill guards, and fuel caps;

b.   Any other counterfeit items bearing the name or trademarks belonging to FCA US LLC, including Jeep and RUBICON;

c.   All labels, stickers, external packaging, and other materials related to, or used for, automotive parts or accessories, including those containing the name or trademarks of FCA US LLC, including Jeep and RUBICON;

d.   Documents or records related to the production, acquisition, testing, marketing, storage, labeling, packaging, or distribution of items identified in paragraph 1(a), including but not limited to receipts, purchase orders, invoices, ledgers, correspondence, customer/supplier lists, bank records, labels, and test reports.

e.   Documents or records relating to any proceeds of transactions involving items identified in paragraph 1(a), including but not limited to records relating to account 3538358541 at Wells Fargo Bank NA or any other accounts in the name of Dave's Auto Accessories, DAVID ENAYATI, or SHAWN

ENAYATI.

      f.   Between June 1, 2016 and the present:

         i.   Any business and financial records of Dave's Auto Accessories or other business entities owned, operated or controlled by DAVID ENAYATI or SHAWN ENAYATI relating to the manufacture, importation, purchase, sale, distribution or storage of counterfeit automotive parts or accessories;

         ii.  Any records, documents, programs, applications, or materials relating to the shipment, importation, transportation, purchase, manufacture, sale, distribution or storage of counterfeit automotive parts and accessories, including U.S. Customs entry forms 3461 and 7501, Entry Summaries, U.S. Customs Manifests of Goods, U.S. Customs declaration forms, invoices, bills of lading, air way bills, purchase orders, general ledgers, subsidiary ledgers, packing slips, and air bills;

         iii. Any records, documents, programs, and materials reflecting bank statements, deposit slips, withdrawal slips, checks, cashier's checks, money orders, wire transfer records, invoices, purchase orders, ledgers and receipts, related to the shipment, importation, exportation, purchase, manufacture, sale, distribution, or storage of counterfeit automotive parts and accessories;

         iv.  Any records, documents, programs, applications, and materials relating to buyers of counterfeit automotive parts and materials, including co-conspirators and any unwitting victims;

v.   Any records, documents, programs, applications and materials relating to online accounts, such as at eBay, to sell automotive parts and accessories, including accounts in the name of Dave's Auto Accessories, DAVID ENAYATI, or SHAWN ENAYATI;

vi.   Any records, documents, programs, applications and materials relating to any negative feedback or customer complaints regarding automotive parts and accessories sold or distributed by Dave's Auto Accessories, DAVID ENAYATI, or SHAWN ENAYATI;

vii. Any records, documents, programs, applications, or materials relating to printed materials and equipment used to prepare counterfeit merchandise for sale, including but not limited to, counterfeit boxes, packaging, labels, holograms, certificates of authenticity, instruction manuals, envelopes, retail commercial boxes, packaging materials, other documents, some of which may be unlabeled or labeled with the various trademarks or other registered trademarks.

g.   Any records, documents, programs, applications or materials showing control, possession, custody or other indicia of occupancy over the SUBJECT PREMISES, or digital media found in the SUBJECT PREMISES, including but not limited to: personal mail, personal identification, utility and other bills, Internet service provider documents, rental documents, mortgage and loan documents, bank account documents, vehicle registration information or ownership warranties, keys, or photographs;

h.    Any records, documents, programs, applications and materials related to any rental agreements or payment for storage facilities or units, building space, shipping containers, post office boxes, and safety deposit boxes, including contracts, applications, leases, invoices, correspondence and keys;

i.    Any records, documents, programs, applications or materials indicating the identity of co-conspirators or containing communications with co-conspirators;

j.    Methods of contact and communication with co-conspirators engaged in the Subject Offenses; and

k.    Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

l.    With respect to any digital device used to facilitate the above-listed violations or containing evidence falling within the scope of the foregoing categories of items to be seized:

i.    evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software,

iv

as well as evidence of the presence or absence of security
software designed to detect malicious software;

                        iii. evidence of the attachment of other devices;

                        iv.  evidence of counter-forensic programs (and
associated data) that are designed to eliminate data from the
device;

                        v.   evidence of the times the device was used;

                        vi.  passwords, encryption keys, biometric keys,
and other access devices that may be necessary to access the
device;

                        vii. applications, utility programs, compilers,
interpreters, or other software, as well as documentation and
manuals, that may be necessary to access the device or to
conduct a forensic examination of it;

                        viii.    records of or information about
Internet Protocol addresses used by the device;

                        ix.  records of or information about the device's
Internet activity, including firewall logs, caches, browser
history and cookies, "bookmarked" or "favorite" web pages,
search terms that the user entered into any Internet search
engine, and records of user-typed web addresses.

    2.   As used herein, the terms "records," "documents,"
"programs," "applications," and "materials" include records,
documents, programs, applications, and materials created,
modified, or stored in any form, including in digital form on
any digital device and any forensic copies thereof.

3.    As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

4.    As described in the affidavit, executing law enforcement agents require the aid of government and/or private industry representatives, investigators or experts; therefore, pursuant to Title 18, United States Code, Section 3105, such private industry experts may participate in the execution of the search warrant provided that their duties are limited to the authority granted to the executing law enforcement agents under this warrant and they act at the direction of, and in direct aid of, law enforcement.

## II. <u>SEARCH PROCEDURE FOR DIGITAL DEVICES</u>

5.   In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii.  The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.   If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

d.   If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.   If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital

device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.    The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.    After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

6.    The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

7.    In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.    Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.    Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.    Any magnetic, electronic, or optical storage device capable of storing digital data;

d.    Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.    Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

8.    During the execution of this search warrant, law enforcement is permitted to: (1) depress D. ENAYATI's and S. ENAYATI's thumb and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of D. ENAYATI's and S. ENAYATI's face with his eyes open to activate the facial-, iris-, or

x

retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

9.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

**AFFIDAVIT**

I, Susan E. O'Brien, being duly sworn, declare and state as follows:

## I.    <u>PURPOSE OF AFFIDAVIT</u>

1.    This affidavit is made in support of an application for a search warrant to search the business located at 1226-1228 E. Florence Avenue, Los Angeles, California 90001 (the "SUBJECT PREMISES"), as described more fully in Attachment A.

2.    The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of Title 18, United States Code, Section 2320(a) (Trafficking in Counterfeit Goods and Services)[1] and Title 18, United States Code, Section 371 (Conspiracy) ("the Subject Offenses"), as described more fully in Attachment B.  Attachments A and B are incorporated herein by reference.

3.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all

---

[1] A person commits a violation of 18 U.S.C. § 2320(a) if s/he "intentionally (1) traffics in goods or services and knowingly uses a counterfeit mark on or in connection with such goods or services, [or] (2) traffics in labels, patches, stickers, wrappers, badges, emblems, medallions, charms, boxes, containers, cans, cases, hangtags, documentation, or packaging of any type or nature, knowing that a counterfeit mark has been applied thereto, the use of which is likely to cause confusion, to cause mistake, or to deceive, . . . ."

conversations and statements described in this affidavit are related in substance and in part only.

## II.  BACKGROUND OF AFFIANT

4.    I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), and have been so employed since October 1995.  I have been assigned to investigate Intellectual Property Rights ("IPR") crimes in Los Angeles for approximately ten years. During that time, I have received both formal and informal IPR training.  I have also conducted Public Corruption, Civil Rights, Involuntary Servitude, and internet-based fraud investigations. During my time as an FBI SA, I have participated in the execution of multiple federal search warrants.

## III. SUMMARY OF INVESTIGATION

5.    Since August 2019, the FBI has been investigating sales of counterfeit automobile bumpers and accessories being sold by "Dave's Auto Accessories" through its eBay.com ("eBay") account ("DavesAutoAcc") and from its physical storefront, located at 1226-1228 E. Florence Avenue, Los Angeles, California 90001 (the SUBJECT PREMISES).  Through two undercover purchases by FBI agents from owner DAVID ENAYATI ("D. ENAYATI") and employee SHAWN ENAYATI ("S. ENAYATI") at the SUBJECT PREMISES, the FBI has confirmed that at least two bumpers sold by D. ENAYATI and S. ENAYATI at the SUBJECT PREMISES contained counterfeit Jeep "RUBICON" trademarked nameplates.  The investigation also revealed that counterfeit Jeep trademarked accessories were also being sold from the SUBJECT PREMISES.  The requested search warrant seeks authorization to seize evidence,

fruits, or instrumentalities of violations of 18 U.S.C. § 2320(a) (Trafficking in Counterfeit Goods and Services) and 18 U.S.C. § 371 (Conspiracy), located at the SUBJECT PREMISES.

### IV.   STATEMENT OF PROBABLE CAUSE

A.   Discovery of Suspected Counterfeit Bumpers Sold on eBay by DavesAutoAcc and Investigation into DavesAutoAcc and the SUBJECT PREMISES

6.   According to its website, Fiat Chrysler Automobiles US LLC ("FCA") is a North American automaker based in Auburn Hills, Michigan.  It designs, manufactures, and sells or distributes vehicles under the Chrysler, Dodge, Jeep, Ram, FIAT and Alfa Romeo brands, as well as the SRT performance designation.  Mopar is a parts manufacturer within FCA.  FCA distributes Mopar and Alfa Romeo parts and accessories for its automobiles.

7.   In or about August 2019, I received a referral from FCA Brand Protection Investigator Thomas Hipelius concerning sales of possible counterfeit Jeep products by eBay seller DavesAutoAcc.  At that time, Investigator Hipelius identified certain items listed on the DavesAutoAcc eBay account he believed infringed upon FCA's registered trademarks.  Specifically, Inspector Hipelius referred to a front bumper for Jeep Wrangler's RUBICON model, as well as other accessories for Jeep vehicles, that were being sold by the DavesAutoAcc eBay account containing FCA's "RUBICON" or "Jeep" trademark.  Based on his review of the photographs and descriptions accompanying the listings on the DavesAutoAcc eBay account, Investigator Hipelius determined that several of the items sold by DavesAutoAcc were likely counterfeit and infringing on FCA's registered trademarks.

8.     On or about November 4, 2019, I reviewed United States Patent and Trademark Office ("USPTO") records and learned that FCA is the owner of a global trademark portfolio for trademarks for use on automobiles and their parts, including, but not limited to:

a.     United States Registration No. 0526175, registered on February 13, 1943, for the word mark "Jeep".

b.     United States Registration No. 2666854, registered on December 24, 2002, for the word mark "RUBICON".

c.     United States Registration No. 0801717, registered on January 11, 1966, for the Chrysler logo:



d.     United States Registration No. 2919922, registered on January 18, 2005, for the Mopar logo:



9.     According to the USPTO website, all four registrations are live trademarks for use in connection with automobiles and automobile parts.

10.    On or about August 5, 2019, I saved a PDF of the listings offered by eBay seller DavesAutoAcc, as of that date. Within its listings, I observed several products advertised for Jeep vehicles.  Specifically, I saw that the front bumper Investigator Hipelius had referenced was advertised by

4

DavesAutoAcc as "For 07-19 Jeep JK JL Wrangler RUBICON 10th
Anniversary Front Bumper" and included information that the
product was "not OEM" and identified the manufacturer as Vevor in
China.  The ad also specified "THIS BUMPER IS AFTERMARKET & IT
COMES WITH LOGO!!"  Based on my investigation of this case and
conversations with Inspector Hipelius, I know that FCA's RUBICON
trademark is displayed on Jeep bumpers via a nameplate that
attaches to the center of the bumper, covers a cutout for the
car's winch, and can be removed to access the winch.  I believe
that the reference to "logo" in the advertisement refers to the
RUBICON trademarked nameplate that accompanies authentic Jeep
bumpers.

     11.   Based on my training and experience investigating
intellectual property rights crimes, and my knowledge of this
investigation, I know that "OEM" stands for "Original Equipment
Manufacturer" and refers to parts made directly by a car's
manufacturer.  "Non-OEM" parts, also known as "aftermarket" parts
are generic automobile parts, including car bumpers, usually
produced by independent manufacturers who normally sell them
cheaper than OEM parts.  However, these aftermarket parts cannot
contain registered trademarks, owned by the original car
manufacturer or company.

     12.   Upon review of the photographs accompanying the
listing for the RUBICON bumper, I observed that one of the
photographs contained a full image of a tan-colored Jeep with the
RUBICON trademark clearly visible on the car's bumper.  Another
photograph showed the front-view of another Jeep bumper with the

RUBICON trademark clearly visible.  However, two other
photographs accompanying the listing showed close-up images of
the outside and inside of the bumper.  In these images, the
nameplate area of the bumper (where the RUBICON trademark would
be seen) was "blacked-out" such that the RUBICON trademark was
obscured.  Based upon my experience investigating intellectual
property rights crimes, including my experience purchasing
suspected counterfeit goods from online vendors, I know that
sellers of counterfeit goods sometimes black-out trademarks in an
effort to conceal a registered trademark and circumvent eBay's
anti-counterfeiting measures.

13.   Based on eBay subscriber records obtained for
DavesAutoAcc, I determined that the account was registered to D.
ENAYATI on or about July 20, 2016.  The records list the contact
and shipping information as the SUBJECT PREMISES.  The records
also list the account's telephone number as (310) 867-1880 and
its email address as "davesautoaccessories@gmail.com".

14.   Upon further review of DavesAutoAcc's eBay page, I
observed that it claimed to be a "certified Jeep dealer".
However, based upon information provided to me by Inspector
Hipelius, I know that authentic Jeep RUBICON bumpers and
nameplates are manufactured by FCA in the greater Michigan area.
I also know from Inspector Hipelius that he consulted an FCA
Group Licensing representative and confirmed that FCA does not
have a certified dealer or dealership program.  Thus, neither
DavesAutoAcc nor "Dave's Auto Accessories" is an authorized or
certified Jeep dealer or dealership.

15.   On or a about August 7, 2019, I searched open source public records and discovered a storefront operation for "Dave's Auto Accessories" in Los Angeles, California, located at the SUBJECT PREMISES.  The website "www.davesautoacc.com" was also associated with the SUBJECT PREMISES.  Further public record searches revealed that D. ENAYATI is the current Registered Agent for Dave's Auto Accessories at the SUBJECT PREMISES.  According to its public Yelp.com profile, Dave's Auto Accessories specializes in after-market customization for automobiles and trucks, with a focus on Jeep-brand vehicles.

   B.   September 23, 2019 Undercover Purchase at the SUBJECT PREMISES

        1.   Purchase of front bumper with RUBICON nameplate and other Jeep trademarked accessories

16.   On or about September 23, 2019, two FBI Undercover Employees (UCE-8925-SAC ("UCE 1") and UCE-4684 ("UCE 2")) went to the SUBJECT PREMISES and purchased a 10th Anniversary Jeep Wrangler RUBICON front bumper suspected to be counterfeit.  UCE 1 was equipped with audio and video recording devices during the undercover operation.  I reviewed these audio and video recordings and observed the following:

        a.   The numbers "1226-28" were stenciled in large numbers on the transom above the double door entry/exit to the SUBJECT PREMISES.  "1226" was affixed vertically to the exterior side of one of the doors.  The logo, "Dave's Auto Accessories" with a pinup girl on a red background and encircled by stars was above the address.  The front of the store was composed of large, plate glass windows.

b.    When the UCEs entered the SUBJECT PREMISES, they
began a conversation with a store employee named "Sean"
(believed to be S. ENAYATI) regarding purchasing a Jeep RUBICON
front bumper.  Over the course of the conversation, S. ENAYATI
advised the UCEs that the bumper they were purchasing was not
original and told the UCEs it was an after-market bumper made in
China.  S. ENAYATI affirmed that the bumper was "the same exact
thing" as an authentic Jeep bumper.  At that same time, an
unnamed employee ("Employee 1") told the UCEs that "it is the
same quality".  Because UCE 1 was willing to pay cash, S.
ENAYATI quoted the price for the RUBICON front bumper as $500.
S. ENAYATI then directed a second unnamed employee ("Employee
2") to retrieve one of the "heavy" bumpers from outside.

c.    While the employee was retrieving the bumper from
the rear of the store another man came up to the UCEs,
identified himself as "David" (believed to be D. ENAYATI), and
took over the transaction with the UCEs.  During his
conversation with the UCEs, D. ENAYATI confirmed that Dave's
Auto Accessories was the eBay seller "DavesAutoAcc" and said
that he carried all types of Jeep-branded accessories.  After
further discussion, and in addition to the RUBICON front bumper,
D. ENAYATI also sold UCE 1 a fuel door, a four-piece set of
splash guards, and a four-door set of door sills, all containing
the Jeep trademark.  The total amount for the entire purchase
was $600.  UCE 1 paid ENAYATI $600 in cash and received a
receipt for all of the items purchased.

d.   D. ENAYATI also provided the UCEs with a business card that included the names of D. ENAYATI and S. ENAYATI with individual phone numbers, (310) 867-1880 (the number listed in the eBay subscriber records for "davesautoacc") and (310) 903-0739, respectively, as well as contact information for the SUBJECT PREMISES and the website address "davesautoacc.com".

e.   During the transaction, Employee 2 advised the UCEs that they had only recently opened the storefront and until about one year ago, all sales had been done online.  The employee said he believed Dave's Auto Accessories had been operating online for at least two years.

2.   <u>FCA confirmed the front bumper with RUBICON nameplate and the Jeep trademarked accessories were not authentic Jeep parts and accessories</u>

17.   On or about September 24 and 25, 2019, I provided Inspector Hipelius with photographs of the purchased items and still images captured from UCE 1's video recording.  Inspector Hipelius advised me that he reviewed the photographs of the suspected counterfeit items and observed that the Mopar and Chrysler markings present on all authentic Jeep automobile parts were missing from these items.  He also advised that the packaging for these items was not consistent with the packaging used for authentic Jeep automobile parts and accessories.

18.   On or about October 2, 2019, Inspector Hipelius provided the FBI with a written report detailing his examination of the photographs of the items purchased by the UCEs.  Inspector Hipelius's examination determined that the items purchased from the SUBJECT PREMISES on September 23, 2019 contained FCA's

RUBICON or Jeep trademarks but were not authentic Jeep parts and likely counterfeit. Specifically, Inspector Hipelius identified multiple differences between the items purchased at the SUBJECT PREMISES and authentic Jeep parts, including the following:

a. Specific to the front bumper's RUBICON nameplate, which contained the RUBICON trademark, Inspector Hipelius noted the font used to spell "RUBICON" was incorrect, the manufacturing marks or numbers were missing, and the plate lacked the trademarked Chrysler Pentastar that would be present on an authentic Jeep RUBICON nameplate.

b. Specific to the front bumper itself, Inspector Hipelius noted that headlights on an authentic Jeep RUBICON bumper are attached with cowlings marked with the trademarked Chrysler Pentastar, which this bumper did not have. Additionally, and also inconsistent with an authentic Mopar-manufactured Jeep bumper, the bumper came in three pieces, was not accompanied by Mopar installation instructions, the outside carton lacked the approved Mopar labels, and a "FRAGILE" sticker on the outside carton, written in English and Chinese, was inconsistent with package markings on an authentic Jeep bumpers.

c. Additionally, Inspector Hipelius's report provided indicators explaining how he was able to determine that the other accessories purchased at the SUBJECT PREMISES, which all contained the Jeep trademark, were not authentic Jeep parts. First, and similar to the RUBICON bumper, the packaging for the accessories was inconsistent with authentic Mopar packaging, which normally includes the Mopar label with the specific part

number.  Additionally, all of the accessories were missing
manufacturing marks or numbers and country of origin
information, which would be present on authentic Mopar parts and
accessories.  Specific to the fuel door and splash guards, the
Jeep font on both items was inconsistent with a genuine Mopar
fuel door and the instructions provided for both items were not
consistent with authentic Mopar brand instructions.  Specific to
the door sills, the Jeep font on the sills was inconsistent with
an authentic Mopar part, the adhesive tape used on the sills was
not consistent with an authentic Jeep part, and the production
clock was stamped in a manner inconsistent with an authentic
Mopar part.

     C.   October 17, 2019 Undercover Purchase at the SUBJECT
          PREMISES
          1.   Purchase of 10th anniversary front bumper with
               RUBICON nameplate

   19.  On or about October 17, 2019, UCE 1, along with
another UCE (UCE-7964 ("UCE 3")) went back to the SUBJECT
PREMISES to purchase another Jeep RUBICON bumper suspected to be
counterfeit.  UCE 3 was equipped with both audio and video
recording devices.  UCE 1 was also equipped with an audio
recording device.  I reviewed these audio and video recordings
and observed the following:

      a.  When the UCEs arrived at the SUBJECT PREMISES,
UCE 3 was greeted by D. ENAYATI.  UCE 3 explained that she was
interested in purchasing a bumper for a 2012 Jeep Wrangler.
UCE 3 consulted with UCE 1 and UCE 1 told D. ENAYATI that he had
recently purchased the 10th Anniversary edition bumper from D.

ENAYATI at the SUBJECT PREMISES.  As UCE 3 looked at the bumpers on display in the SUBJECT PREMISES, D. ENAYATI explained that the items on display were older bumpers and that he now sells all steel bumpers for Jeep automobiles.  D. ENAYATI stated that he received complaints that the mixed material bumpers dented easily but claimed that these all-steel bumpers did not.

b.    During the conversation, Employee 2 told UCE 3 that they have the "RUBICON" one.  UCE 3 then confirmed she wanted the RUBICON version and asked if it was the same.  The employee responded, "It is exactly the same thing, except instead of Jeep it says RUBICON."  This same employee also provided the UCEs with a brochure for business named "Hollywood Accessories".  D. ENAYATI later explained that they were expanding the business to include Hollywood Accessories, which would sell conversion kits for cars.

c.    During the transaction, a large sign for "Hollywood Accessories" was visible on the floor, inside the SUBJECT PREMISES.  The graphic for the Hollywood Accessories sign was similar to the pinup girl graphic for Dave's Auto Accessories, located on the outside of the SUBJECT PREMISES.

d.    In response to a question from UCE 3 regarding whether installation instructions were included, D. ENAYATI told her that he typically refers people to YouTube for videos demonstrating installation.

e.    D. ENAYATI proceeded to unbox the bumper UCE 3 intended to purchase.  The box was overall brown in color and secured with heavy plastic straps.  D. ENAYATI removed a

smaller, plain brown box and advised the hardware and RUBICON nameplate were in this smaller box.

      f.  Upon examining the contents of the box, UCE 3 asked if the bumper came with the RUBICON logo.  D. ENAYATI responded, "Really, really it doesn't, but I carry . . . I do have RUBICON.  I'll get it for you guys.  That's not an issue."

      g.  In response to a question from UCE 3 regarding whether the bumper was comparable to a regular Jeep bumper, D. ENAYTI advised it was the "same".  D. ENAYATI went on to say, "We say OEM.  That means original from the manufacture.  This is not OEM.  Mopar is the brand that makes the Jeep.  So, like a Mopar version of this bumper runs around twelve to fifteen hundred dollars.  This is not Mopar.  This is not OEM.  We call it after-market.  It's an after-market.  It's a replica."  He assured UCE 3 that this bumper would hold up in an accident.  D. ENAYATI then advised that this bumper comes with a blank nameplate, and then departed to a different area of the store.  A moment later he returned with a nameplate containing the "RUBICON" trademark.

      h.  D. ENAYATI quoted the bumper for sale at $500 and requested an additional $10 for the RUBICON nameplate.  He told UCE 3 that he usually charges $50 for the nameplate.  D. ENAYTAI then attempted to sell UCE 3 other Jeep-branded accessories.  He showed her a four-piece set of door entry guards, and told her they were "replicas, but cheaper."  He also offered her a gas cap containing the Jeep trademark and Jeep entry guards for $50. UCE 3 declined the other products and paid D. ENAYATI $510 in

cash for the bumper and RUBICON nameplate and received a receipt for the same.

i.   D. ENAYATI advised the UCEs that he and his cousin, S. ENAYATI, have been in this business for three years and that they had begun to offer kits for other types of cars. He also stated that his online sales were through eBay and Amazon.  He noted that his website was still under construction, so he was not able to make any sales directly from the website.

2.   <u>FCA confirmed that the front bumper with RUBICON nameplate was not an authentic Jeep part or accessory</u>

20.   On or about October 17, 2019, I provided Inspector Hipelius photographs of the bumper and RUBICON nameplate purchased by the UCEs earlier that day.  On or about October 21, 2019, Inspector Hipelius provided a written report detailing his examination of the photographs and his determination that neither the bumper nor the nameplate containing the RUBICON trademark were authentic Jeep parts.

21.   Specifically, Inspector Hipelius identified multiple differences between the bumper and RUBICON nameplate purchased at the SUBJECT PREMISES and authentic Jeep parts, including that the Mopar and Chrysler markings present on all authentic Jeep bumpers were missing from the bumper bought at the SUBJECT PREMISES. Additionally, the bumper's outside carton packaging was cut in a fashion inconsistent the genuine Mopar part and was lacking the approved Mopar labels, part number, and indication that the United States was the country of origin.  Unlike authentic Jeep bumpers, this bumper also did not have headlights attached with

cowlings marked with the trademarked Chrysler Pentastar.  The
bumper's metal close-out panel, located on the top center portion
of the suspect bumper, was also attached in a manner inconsistent
with a genuine Mopar, the bolts and fasteners used to connect the
various metal plates of the bumper were also not inconsistent
with a genuine Mopar part, and the bumper did not come with Mopar
installation instructions.

### D.   Additional Investigation of Dave's Auto Accessories

22.   On or about October 29, 2019, I reviewed Google
subscriber records for the email account "davesautoacc@gmail.com"
and learned the account was created on June 27, 2017, in the name
"David Enayati" and listed the telephone number as (310) 867-1880
(the number listed in the eBay subscriber records for
"davesautoacc" and printed on D. ENAYATI's business card).  The
Google records also revealed that the account had a recovery
email of "davesautoaccessoris@gmail.com".[2]

23.   On or about October 16, 2019, I reviewed PayPal
subscriber information and activity records for accounts
associated with "davesautoacc@gmail.com" and learned that on or
about July 20, 2016, an account for "Daves Auto Accessories",
with URL "davesautoacc.com", was created.  The records listed the
PayPal account's email addresses as
"davesautoaccessories@gmail.com" and "davesautoacc@gmail.com".
The PayPal user information listed D. ENAYATI.  The PayPal

---

[2] This recovery email may contain a typographical error, as
D. ENAYATI used "davesautoaccessories@gmail.com" for other
accounts.

records also listed the subscriber's telephone numbers as (310) 867-1880, (310) 903-0739, and (323) 553-9321.  The first two numbers were the same numbers printed on the business cards given to the UCEs during the first undercover purchase.

24.  A review of the activity records for the PayPal Account revealed that approximately $429,003 was received into this account and approximately $72,225 sent out and that Wells Fargo Bank NA, checking account 3538350541, is the active, primary bank account for the PayPal Account.  The records also included the following transactional information:

a.  Between August 11, 2018 and September 19, 2019, 18 transactions were captioned as "07-17 Jeep RUBICON 10th anniversary front & rear bumper with Front Full end cap", "2007-2018 Jeep Wrangler JK 10th ANNIVERSARY RUBICON FRONT BUMPER", "FOR 07-19 Jeep JK JL Wrangler RUBICON 10th Anniversary Front Bumper", and "Jeep JK 07-17 Wrangler RUBICON 10th Anniversary Front & Rear Bumpers W Hardware."

b.  These 18 transactions ranged in amounts from $479 for a single bumper to $1,400 for a front and rear bumpers with an end cap.  The buyers for these 18 transactions had shipping addresses in Florida, Texas, Kentucky, New York, California, New Jersey, New Mexico, and Missouri.

25.  On or about October 17, 2019, I searched public records for Hollywood Accessories, Inc. and learned that the Articles of Incorporation for that company were filed on or about April 9, 2019, and that D. ENAYATI is the Registered Agent with a listed address as the SUBJECT PREMISES.

16

26.   Since August 2019, I have periodically visited the website daveautoacc.com.  On or about November 8, 2019, I visited the site and observed the site was more developed than on previous visits.  Among other things, I reviewed a new "About Us" tab on the website and learned that D. ENAYATI and S. ENAYATI are cousins and Jeep enthusiasts.  The website noted that D. ENAYATI and S. ENAYATI operated their business as an e-commerce warehouse for the first two years, and in the past year opened the showroom/warehouse in South Los Angeles at the SUBJECT PREMISES.  A review of the website revealed the following:

a.   All of the items offered for sale are listed as either Dave's Auto Accessories or Hollywood Accessories.

b.   All of the items purchased by the UCEs on September 23, 2019, were listed as available products but were currently sold out.  The words "Jeep" and "RUBICON" are visible on the products' images on the website.

c.   JK mudguard mud flaps were being sold on the website and the listing specified "logo".  The accompanying photos included the word "Jeep" on the mud flaps.  The product description stated, "These Are Aftermarket Accessories.  Comes with Jeep Logo."[3]

---

[3] There are also listings on the website for various other automobile parts and accessories which do not contain any readily identifiable trademarks, including JL mudguard mud flaps that specify "no logo" and do not contain the Jeep trademark.

## V.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES[4]

27. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents,

---

[4] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

28.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

29.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a

device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

      b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

      c.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress D. ENAYATI's and S. ENAYATI's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of D. ENAYATI's and S. ENAYATI's face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

## VI.  Non-Law Enforcement Personnel

    30.   I request the Court's permission to have non-law enforcement personnel present during the execution of the search warrant. The presence of government and/or private industry representatives, investigators or experts, who have received training in identifying counterfeit automotive accessories, will assist law enforcement personnel in identifying these counterfeit goods. The identification of these counterfeit goods is

necessary to aid the executing agents in determining violations of the Subject Offenses and particularly, will help limit the number of items seized during the search.

### VII. CONCLUSION

31.   For all the reasons described above, I respectfully submit there is probable cause to believe the items listed in Attachment B, which constitute evidence, instrumentalities, and fruits of violations of the Subject Offenses, will be found at the SUBJECT PREMISES, as described in Attachment A.


Susan E. O'Brien
Special Agent
Federal Bureau of Investigation


Subscribed to and sworn before me
on January __, 2020.


THE HONORABLE ALEXANDER F. MACKINNON
UNITED STATES MAGISTRATE JUDGE